# CHARLESTON.

## WESTERMAN *et als v.* DINSMORE *et als.*

Submitted February 16, 1910.    Decided February 7, 1911.

1.   MINES AND MINERALS—*Oil and Gas Lease—Provisions for Forfeiture—Time as Essence.*

Time is of the essence of a condition in an oil and gas lease, making it forfeitable for failure to drill a well within a specified time or pay a certain periodical rental or commutaton in advance.

68 W. Va.

2.  SAME—*Release from Forfeiture of an Oil and Gas Lease.*
    Equity will relieve from a forfeiture of such a lease for non-performance of the condition, occasioned by fraud, accident, mistake or inequitable conduct of the lessor, provided its aid is sought with reasonable diligence.

3.  SAME—*Release from Forfeiture—Laches.*
    Unreasonable delay, under the peculiar circumstances of any given case, will bar such relief, the rule of laches applying with all its vigor and force.

4.  SAME—*Release from Forfeiture of Oil and Gas Lease.*
    If the lessor, after such a forfeiture, not superinduced by his own inequitable conduct, materially alter his condition, relying in good faith upon the forfeiture, or, if, in any case of such forfeiture, the rights of innocent third parties have intervened, equity will not relieve.

5.  SAME—*Jurisdiction—Release from Forfeiture of Oil and Gas Lease—Necessity for Diligence.*
    On the principle of estoppel, laches forbids delay in the assertion of a claim for relief from such a forfeiture with intent to claim or abandon the right according to the event. Equity will not tolerate a fast and loose policy.

6.  SAME—*Mutual Right of Cotenant.*
    A cotenant in a lease which has been forfeited does not become a trustee for his associates in the ownership of such lease by the taking of a new one on the same premises, since the subject matter of the cotenancy has become non-existent, the unrelieved forfeiture having put an end to the term created by the prior lease, and the subsequent one having brought into existence a new and independent estate in respect to which there never was any cotenancy.

7.  SAME.
    Under such circumstances, the right of the cotenants is limited to the identical term in respect to which the cotenancy existed, enforceable by a timely application for relief from the forfeiture.

Appeal from Circuit Court, Pleasants County.

Bill by C. G. Westerman and others against L. D. Dinsmore and others. Decree for defendants, and plaintiffs appeal.

*Affirmed.*

*Thos. P. Jacobs,* for appellants.

*J. F. Barron* and *Van Winkle & Ambler,* for appellees.

POFFENBARGER, JUDGE:

The appellants, C. G. Westerman and others, filed their bill in the circuit court of Pleasants county for relief against forfeiture of an oil and gas lease, in which they were interested, and to enjoin the appellees from operating under a subsequent one on the same land. The preliminary injunction, granted thereon, was dissolved and the bill dismissed.

The old lease for a term of two years, dated Aug. 17, 1907, covering 77 acres, executed to L. J. Murphy, by Lloyd Bailey and wife, contained the following condition: "Provided that this lease shall become null and void unless operations shall be commenced on the premises and a well completed, unavoidable delay or accident excepted, within two months from the date hereof, or unless lessee shall pay at the rate of Fifteen Dollars per month payable monthly in advance thereafter for each additional month such completion of well is delayed." Murphy obtained from William Ruttencutter a similar lease, bearing the same date, on an adjacent tract of land, containing 225 acres. On Nov. 4, 1907, he assigned three-fourths of each of these leases to Westerman, for and in consideration of $750.00, which was paid, Murphy agreeing, as part of his contract with Westerman, to drill and complete a well on the Ruttencutter lease, and such additional wells, as should be agreed upon, were to be drilled at their joint expense. Four unproductive wells were drilled on the Ruttencutter land by March 4, 1908, but none on the Bailey tract. Such further dispositions of interests in the leaseholds were made that A. E. Brast became the owner of three-sixteenths, P. A. Schumuck of two-sixteenths, W. P. Simmons of three-sixteenths, Justus Eakin of two-sixteenths, L. J. Murphy of three-sixteenths and Westerman of three-sixteenths. The expense incurred on account of these leases and the work done as aforesaid amounted to about $3,000.00, and the casing and other materials and appliances on the Ruttencutter lease were worth several hundred dollars. Under the Bailey lease, rentals were paid but no drilling done, while operations were in progress on the other property. These rentals were paid on the day, named in the lease, until July, 1908, when there was a delay of ten days, which Westerman, who was attending to that branch of the business, explained by saying it had resulted from confusion in dates, rental under the other lease having been

paid, when that under the Bailey lease should have been. This was accepted by Noland, Executor of the will of Bailey who had died. Instead of paying on August 17th for the month commencing on that date, Westerman delayed payment until about Aug. 26th, and Noland returned his check, saying "As you failed to pay last month's rental when due, the Baileys thought you did not want the lease longer, and notified me that they had leased the land to another, and for me not to receive the rent, if sent." To this Westerman made no reply; nor did he or any one else, holding under the lease, render or pay any further rentals.

On August 22, 1908, before the remittance of the rental that should have been paid on the 17th, the Bailey devisees had executed a new lease to L. J. Murphy, the same person who had taken the former lease. In the new lease, the old one was recognized by the following clause: "This lease being upon the same land leased to L. J. Murphy by Lloyd Bailey during his lifetime." It was recorded on the 29th day of August, 1908. On the 24th day of November, L. J. Murphy assigned seven-eights of his interest in this lease to his son, R. O. Murphy, in consideration of $130,00. On December 3rd, he assigned the remaining one eighth to the same party in consideration of $50.00. On November 28th, R. O. Murphy assigned a five-eighths interest in the lease to John B. Murphy, of Washington, Pa., in consideration of $400.00, the assignor agreeing to put down a well on the lease with reasonable diligence. On December 1, 1908, R. O. Murphy assigned, to Elmer Edmonds, a one-eighth interest in the lease and agreed to pay him $350.00, in consideration of his completing a well on the lease. On the 29th day of December, R. O. Murphy assigned, to L. D. Dinsmore, his remaining one-fourth interest, together with like interests in three other leases he had, one on other lands of the Baileys, another on lands of Mrs. S. P. Lamp and another on lands of Mrs. Maggie Lamp, Dinsmore paying him $3,650.00 cash and agreeing to pay, keep and perform all the covenants contained in said leases, and pay all outstanding indebtedness against the interest so assigned. On December 18th, John B. Murphy, in consideration of $200.00, assigned to W. McK. Smith, a one-fourth interest in the Bailey lease. Edmonds and the Murphys completed a producing well on the Bailey tract about

the 22nd day of December, 1908. On the question of notice, the following facts are material: Westerman was informed by Noland's letter of August 26th that a new lease had been executed, but the name of the lessee was withheld. The lease under which Westerman and his associates claimed was not admitted to record until December 29, 1908, at 12:50 P. M. The new lease and the assignments of interests therein were recorded very soon after the execution thereof, Dinsmore's on Dec. 29th and W. McK. Smith's on Dec. 30, 1908. As to when Westerman ascertained that L. J. Murphy was the new lessee, the evidence is conflicting, but it leaves no doubt that he had sufficient information to put him upon inquiry as to the fact early in December, 1908. Murphy and others endeavored to charge him with notice in October, 1908. He claims not to have known of any entry upon the leased premises by the new lessees until December 29, 1908, a few days after the well had been completed. Nor did he ever give any notice to Murphy or any one else, claiming under the new lease, of his intention to try to hold the property under the old one. The institution of this suit, on the 15th day of March, 1909, was the first act of the plaintiffs, signifying intent to resist the claims asserted under the new lease.

Time is of the essence of a condition to pay rental or commutation money to prevent forfeiture of an oil or gas lease for failure to drill a well within a stipulated time. For this universally recognized proposition, not denied or questioned in the argument, no authority need be cited. However, it may be possible that this quality can be extinguished by subsequent parol agreement or conduct, just as it can be imparted, in the same way, to an agreement in which it did not originally exist. This is rather suggested in *Hukill* v. *Myers,* 36 W. Va. 639, and *Railroad Co.* v. *Triadelphia,* 58 W. Va. 487. Both of these cases, as well as many others, assert jurisdiction in equity, based upon estoppel and waiver, to relieve from the effect of non-compliance with a condition in which time is made essential, on proof of a course of conduct by the parties contrary to the terms of the stipulation as to time. Jurisdiction in equity to relieve against forfeitures of certain kinds and within certain limitations, without proof of such previous conduct, is also firmly established. Whether, in the former class of cases, essentiality of time is eliminated from the contract by conduct, or allowed to remain and

relief from the forfeiture given, is rather an academic question, since the result is the same in either event. But, if conduct may extinguish it, as suggested, it will most assuredly restore it, for it may be imparted by conduct to stipulations of which it was not originally a part. *Jackson* v. *Lignon,* 3 Leigh 161.

This bill proceeds upon the theory of an established course of conduct, relating to the time of payment, at variance with the terms of the lease, under a claim of acceptance of rentals after the stipulated time of payment on three or four occasions, not sustained by the evidence. There was an express postponement of the rent due on October 17, 1907, until November 17, 1907. A check for rental bears date Nov. 15, 1907, and a receipt for the same Nov. 16, 1907; a receipt for the next month's rent bears date, Dec. 16, 1907; a check and a receipt for the next month's rent are each dated Jan. 17, 1908; a check for the next month's rent is dated Feb. 17, 1908; one for the next month, Mar. 16, 1908; and one for the next, Apr. 17, 1908. While the brief does not say so, this payment is evidently one of the alleged departures from the contract. A registry return receipt says delivery of the letter was made, Apr. 18, 1908, but this fails to show it was not in the post office at St. Mary's on the 17th, when it should have been. A check for the next month's rent bears date May 16, 1908, and the registry return receipt says the letter was delivered May 18th, 1908. This is likely another alleged departure, but it is not proven. The check for the next month's rent bears date, June 17, 1908. The payment that should have been made, July 17th, was not made until Aug. 27th. The letter transmitting the check says: "Through an error Mr. Ruttencutter's rental was paid on July 16th instead of yours. Hoping this will be satisfactory, I am" &c. The next payment, tendered on August 26th or 27th and declined, as hereinbefore stated, seems to have been delayed through an error, resulting from the former error. Westerman's bookkeeper says he was misled as to the date by the date of the July check, but this mistake is not shown to have been tendered to the lessor as an excuse for the delay. The excuse given for the delay in July was accepted. None was offered for the delay in August. We are unable to say this single condonation of delay, founded upon an excuse and apology, justified Westerman in the belief and assumption that the stipulation in the contract would be waived

as to the next payment. This finding and conclusion, as to the facts and their interpretation, make a clear and plain case of forfeiture. This, however, would not preclude relief under the principles above stated.

The forfeiture extinguished the legal right of the plaintiffs. Thereafter they could claim no more than a mere equity, possibly resting in the discretion of the court, unless some other principle affords them a claim of right on a different ground. While the authorities do not explicitly assert the duty of haste and diligence in seeking relief under such circumstances, we are of the opinion that it must necessarily exist. Rescission, cancellation and other similar forms of relief, based upon fraud, accident, mistake and the like, are matters of absolute right, though they render the contracts, in respect to which they may be obtained, only voidable. In such cases, relief follows allegation and proof of the fact as a matter of course; but, if the circumstances are such as to impose, in equity and conscience, a duty of election, unreasonable delay is fatal, and what is reasonable diligence depends upon circumstances. Thus legal rights are sometimes lost by conduct under the principles of laches and estoppel. In the case of a plain forfeiture, not induced or caused by fraud or inequitable conduct on the part of the beneficiary thereof, the legal right is wholly lost. Nothing remains but a mere equity. Such a case seems to me to impose duty to exercise a high degree of diligence and demand full protection to every right and interest, respecting the property, obtained by third persons in good faith, and also preclusion of relief against the beneficiary, when, in reliance upon the forfeiture, he has in good faith altered his condition by making a new contract or otherwise. Relief against contracts, fraudulently obtained, is sometimes barred by delay of only a few months. *Whittaker* v. *S. W. Va. Imp. Co.,* 34 W. Va. 217; *Hunt* v. *Blanton,* 89 Ind. 38; *Seiveking* v. *Litzler,* 31 Ind. 13; *Strong* v. *Strong,* 102 N. Y. 69. In cases of application for relief from forfeiture, the rule of laches ought to be rigidly applied, for there is no absolute right even in equity, when time is made essential by the contract in express terms or the nature of the subject matter and circumstances. Pom. Eq. Jur. section 455. Some authorities say that relief will not be given at all under such circumstances. 16 Cyc. 78. Personally I doubt the soundness

of decisions so holding, but it is unnecessary to review them. Assuming susceptibility of relief from forfeiture, resulting from non-compliance with such a stipulation, we think the conduct of the plaintiffs, herein set forth in detail, constitutes laches, barring it, as to all against whom it is sought on the sole ground of equity jurisdiction to relieve from forfeitures.

Westerman, promptly advised of the declaration of forfeiture, made no complaint, offered no excuse for delay of payment, acquiesced in it, abstained from inquiry as to the identity of the new lessee and as to operation under the new lease, and delayed assertion of claim or right by suit for seven months, in which period, the new lessees, by the expenditure of considerable money, had brought in a producing well. His claim of ignorance of operation under the new lease cannot be accepted, in view of knowledge, as early as August, 1908, of the execution thereof. That sufficed to put him upon inquiry, and made his ignorance of subsequent open and patent transactions inexcusable. It was due either to gross negligence or deliberate and wilful abstension from inquiry. Either bars relief on the principle of estoppel.

By negligence or design, the plaintiffs permitted a material change in the value and condition of the property to occur and the rights of third parties to intervene, before they sought relief from the forfeiture. Such conduct is everywhere condemned as being inequitable. *Hale* v. *Hale,* 62 W. Va. 609, 612; *Depue* v. *Miller,* 65 W. Va. 120, 131; *Lafferty* v. *Lafferty,* 42 W. Va. 783; *Whittaker* v. *S. W. Va. &c. Co.,* 34 W. Va. 217; *Trader* v. *Jarvis,* 23 W. Va. 100. Some of the evidence indicates intention on their part to await the event of operations on the lease and make their election depend upon the results, a course of conduct forbidden by the rule of laches. *Anthony* v. *Leftwich,* 3 Rand. 238; *Willard* v. *Tayloe,* 8 Wall. 557.

An alleged trust relation between L. J. Murphy and the plaintiffs, founded upon the circumstances under which he took the new lease, he having been a joint owner with the plaintiffs under the old one, constitutes an equity wholly different in nature from the one we have been discussing, if established and not subsequently destroyed. That the acquisition of a new lease on property covered by a former one, by a tenant in common under such former one, after forfeiture thereof, falls within the principle, making a tenant in common who buys in an outstanding supe-

rior title a trustee for his cotenants, is a plausible view. The lease creates a term, subject to forfeiture for non-performance of a condition subsequent, similar in some respect to a freehold liable to forfeiture for non-entry for taxation and sale for non-payment of taxes, or sale to satisfy a lien by deed of trust or mortgage, in all which cases a purchase by a cotenant is deemed and held to have been made for the common benefit of himself and his cotenants. But are the cases so nearly analogous as to call for the application of this principle? There is a material and radical difference. By rightful declaration of forfeiture the lessor destroys the term—clears his land from the burden thereof. It ceases to exist. He is again clothed with absolute and plenary power over his land and may create a new lease or not as he sees fit, and give it to whom he pleases. If he executes a new one, the lessee therein becomes the owner of an entirely new estate, which the lessor has undoubted power to create. A mere term for years, forfeitable by the lessor for non-performance of a covenant or condition subsequent, is not like a non-forfeitable freehold, extending until the happening of a contingency, or an estate in fee simple, continuing forever. Unlike them, the means of its own destruction are inherent in it and borne on its face. Though one of these should be sold for a debt or taxes or become subordinate to a better outstanding title, it does not cease to exist. It is not destroyed. A cotenant, purchasing at such a sale thereof, obtains the subject matter of the cotenancy, and, purchasing an outstanding title, strengthens his hold upon that subject matter. He obtains or retains it. After such transaction, he has in his hands, by virtue of his purchase, the identical thing he previously held in common with his cotenants, and equity demands, subject to certain conditions, a continuation of the pre-existing relation among them. As the forfeiture of the lease, not relieved nor relievable, destroys the subject matter of the cotenancy, and the execution of a new lease, brings into existence a separate and distinct thing, there is no basis for the continuance of the former relation of cotenancy. All equitable considerations are overridden and destroyed by the legal dominion and power in the lessor over his property, out of which the new estate is carved, arising by virtue of the forfeiture. In reaching this conclusion, we do not ignore the ground usually stated as the basis of the equity out of which the trust springs,

on a purchase by a cotenant, namely, his failure of duty, causing the sale, non-payment of the taxes or debt for which it was made. This failure of duty and continued existence of the subject matter of the cotenancy unite in those cases with which it is said this one can be assimilated. We differentiate this case on the ground of the non-existence of one of these two necessary elements or factors. The precedents do not extend to it, nor does the principle include it. *Pyle* v. *Henderson,* 65 W. Va. 39, relied upon in this connection, does not assert the contrary of this proposition. There the forfeiture claimed either did not exist at all, or was relievable as against the lessor, on account of a breach of his implied covenant for quiet enjoyment, or inequitable conduct, causing default in respect to payment of the rental. The decree restored the old term or lease in which the plaintiffs were jointly interested, or declared it never to have terminated or ceased to exist. They neither sought nor obtained, nor did the court take jurisdiction to give them, a new lease or any interest in one. Nor does *Potts* v. *Fitch,* 47 W. Va. 63, conflict with this view. Potts was let into a lease which constituted the subject matter of his contract with Fitch and others, a new lease, but one obtained under and in pursuance of the agreement. The plaintiffs here had no agreement with L. J. Murphy by which he was to obtain a new lease on the property for their common benefit. There is neither claim nor evidence of any such an agreement. Murphy does say he intended to let them into it, upon conditions to be agreed upon, but not that he obtained it in pursuance of any agreement of that kind. He denies the existence of any such agreement and also communication to any of the plaintiffs of his admitted intent or desire to associate them with him under the new lease. This lease is new, not only in respect to its commencement and termination, but also in other respects. It is for three years and contains a covenant to drill a well within one month or pay rentals. The other was for two years without such a covenant, providing only that it should become void, unless a well should be completed in two months or rentals paid monthly in advance. It gives the lessor a better contract which, by reason of the forfeiture, he was free to obtain from anybody willing to give it.

The principles here announced and applied do not prevent relief in any case in which the forfeiture may be set aside for

any reason, such as mistake or accident on the part of the lessee, or fraud on the part of the cotenant, or inequitable conduct on the part of the lessor, causing or superinducing the forfeiture; but they limit the complaining lessee to the acquisition of the estate or term 'which he owned or in which he had an interest, and require him to seek it with reasonable diligence.

There is no evidence of any actual fraud on the part of Murphy. Alleged constructive fraud, arising out of the subsisting relation of cotenancy, is the basis of the suit in so far as it proceeds upon the theory of fraud. Murphy in no way induced or caused the failure to pay the rent when it should have been paid. Nor did Noland, the executor. It was not expected that Murphy should pay the rentals out of his own funds. As to this, the evidence harmonizes. Besides, he kept the new lease wholly in his own name and ownership for three months, after execution and recordation thereof, and almost that long after Westerman had been apprised of its execution. To obtain full information as to the status of the property, it 'was only necessary for the latter to examine the records. Having wholly neglected to take any steps 'for the protection of their interests in the old lease, and awaited the event of operations under the new one, he and his associates utterly fail to make out a case for equitable relief.

Seeing no error in the decree we affirm it. '

*Affirmed.*